## Frank H. Perkins, Appellee, v. Sanitary District of Chicago, Appellant.

### Gen. No. 17,021.

1. ELECTRICITY—*master and servant*. Where a lineman has been injured by an electric shock alleged to have been caused by an uninsulated feed wire coming in contact with a wet pole, it is a question of fact for the jury to determine whether such construction constituted negligence on the part of the defendant.

2. TELEPHONES—*maintenance of feed wires*. Where a telephone company is informed by its superintendent of construction that a certain high voltage feed wire is in a dangerous condition, it is culpable negligence to permit it to remain in that condition for four more days.

3. MASTER AND SERVANT—*assumption of risk*. Whether a lineman employed as a "trouble-shooter" assumed the risk attending the faulty construction of a feed wire, on the ground that from the nature of his work he should have observed its condition, is a question for the jury.

4. MASTER AND SERVANT—*contributory negligence*. Whether a lineman employed as a "trouble-shooter" is guilty of contributory negligence in climbing a pole without inspecting the construction of a feed wire is a question for the jury.

5. MASTER AND SERVANT—*ordinary and usual risk*. The danger attending a loose feed wire coming in contact with a wet pole is not ordinary and usual risk of a "trouble-shooter's" employment, unless he knew of it or was chargeable with knowledge.

6. PLEADING—*variance*. A count which alleges that a wire was not insulated is supported by evidence which shows that although there was a "weather-proof insulation" it was not "man-proof."

7. PLEADING—*aider by verdict*. Though a count, predicated on the duty of an employer to furnish an employe a reasonably safe place to work, does not allege that the employe did not have equal means of knowing the matters of which it is alleged he was ignorant and that the exercise of ordinary care would not have disclosed to him the condition complained of, such defect is cured after verdict where there is evidence tending to substantiate such allegations had they been made.

8. INSTRUCTIONS—*assumption of risk by lineman*. An instruction to the effect that if the plaintiff, a lineman, who was injured by an electric shock, by the exercise of reasonable diligence, etc., could have observed and noted the condition of the phase wire with reference to the pole, then he assumed the risk, etc., is not assignable as reversible error because the court added "and the danger thereof, if any," after the word "condition."

9. INSTRUCTION—*on preponderance of evidence.* It is not error to strike out the words "although but slightly" from an instruction to the effect that if the jury found the evidence bearing upon the material issues preponderated in favor of the defendant, "although but slightly," the plaintiff could not recover.

10. EVIDENCE—*expert.* It is not reversible error to exclude questions that call for expert opinions where the evidence will enable the jury to form an opinion for itself.

11. TRIAL—*conduct of counsel.* The fact that counsel insists upon repeating prejudicial questions after the court has sustained objections to questions of similar import is not ground for reversal where the court cannot say that such conduct influenced the verdict.

Appeal from the Superior Court of Cook county; the Hon BEN M. SMITH, Judge, presiding. Heard in the Branch Appellate Court at the October term, 1910. Affirmed. Opinion filed July 9, 1912. *Certiorari* denied by Supreme Court (making opinion final).

F. J. CANTY, HARRY M. MCCONNELL and GEORGE W. MILLER, for appellant.

JOHN A. BLOOMINGSTON, for appellee.

MR. JUSTICE BARNES delivered the opinion of the court.

The defendant appealed from a judgment for $18,000 recovered by the plaintiff for personal injuries resulting from an electric shock, which he received while in the employ of defendant, doing repair work on a pole carrying electric wires.

The first two accounts of the declaration rest upon an alleged negligent order, which we do not think the proof sustains; but there was sufficient evidence to support the third and fourth counts, which are predicated upon the duty to furnish the plaintiff a reasonably safe place to work. The third count is based upon an alleged negligence in the failure to insulate certain wires, and the fourth charges that defendant negligently furnished a pole and wires defective, dangerous, uninsulated, loose and otherwise improperly attached. It is with reference to these last two counts that we shall consider the record.

The errors assigned are: (1) A failure to direct a verdict for defendant claiming that plaintiff assumed the risk under the conditions under which he undertook the work, that he was guilty of contributory negligence, and that the proof failed to support any of the counts; (2) a failure to give a new trial on the grounds that the verdict was against the weight of the evidence, that there was error in the instructions and rulings of the court, and that the conduct of plaintiff's counsel was improper and prejudicial.

The main question of fact in controversy was the cause of the shock. To understand the respective theories of the parties with regard thereto, a more or less exact description of plaintiff's position and surroundings at the time of the accident is necessary.

Attached to the insulators at the top of the pole in question were three primary wires carrying a current of 12,000 volts, which was conducted therefrom by certain phase or feed wires, so-called, to transformers lower down on the poles, where the current was reduced, and thence carried out on secondary wires to one of defendant's consumers. About half way down the pole, running north and south, were two pairs of cross arms about five feet long; the distance between the upper and lower pairs was about thirty inches. Attached to the upper and lower arms on the east side of the pole, were three transformers, and to those on the west side, were three fuse boxes, one opposite each transformer. A phase or lead wire left each primary wire about eighteen inches north of the pole, and carried the current to a lug in the bottom of a fuse box, thence through a fuse plug, separating said lug from another in the top of the box, and thence through the transformer wire, which connected with the opposite transformer, where the current was reduced as aforesaid. When the fuse plug was removed, or the fuse wires blown, the current terminated at the lower lug, so that, of course, the upper lug and wires beyond it were not electrified.

On the morning of the accident defendant learning that there was trouble with said consumer's current, sent an employe to the pole in question, who removed the fuse plug in the north fuse box. A few hours later, plaintiff was sent out to make repairs in the transformation. No specific instructions or information was given him, further than that the fuse had been removed, and that the trouble was with the transformer. He took with him new tubes or insulators to replace the old ones in the transformer, and wires to re-connect the fuse box with the transformer. He first went up the east side of the pole where he inserted a new tube and wire into the north transformer, and then up the west side where, at the time of the accident as he claims he was scraping or preparing to scrape off the end of said wire that was to be connected in the fuse box.

There was evidence tending to support both defendant's and plaintiff's theories of the shock. It was defendant's theory that plaintiff was not scraping the wire, but that while looking to the ground for a tool he had dropped he in some way carelessly brought his left hand in contact with the live lug in the fuse box, and thus through his own negligence received the shock. The theory of plaintiff was that the phase wire which came down nearest to and across the pole, came in contact with it, through the wind or otherwise, and, as the pole was wet and thus made a more ready conductor, a slight shock was communicated to him, causing him to throw up his arms across the other phase wires, and thus to receive the shock from which he suffered.

Before entering the fuse boxes, the phase wires were tied to the insulators on the west upper cross arm, which were about eighteen inches apart. The wires had some slack, and the one nearest the pole was bent out from it, but was so near that if moved by the wind or otherwise it would strike the pole. The covering of

the phase wires gave weatherproof protection only— that is, against weather conditions, but no protection to one handling the wire when heavily charged—that is, the covering did not insulate the wire in the sense in which insulation is scientifically defined and understood. At the time of the accident plaintiff had fixed his belt to the pole and placed one foot in an iron brace about four and one-half feet below the lower cross arm. He testified that while in such position, leaning back and facing northwest toward the outer feed wires, he held the north transformer wire in his hands and was scraping or about to scrape the covering from the end of it; that as he jerked it he felt a slight shock, and looking up saw a spark from the phase wire across the pole about two or three feet above him; that he threw up his hands across the phase wires, and then received the shock that rendered him unconscious.

An eye observer of the accident saw the spark at about the same place, and plaintiff was further corroborated by evidence that at about the same spot was a burn in the pole, though the evidence was conflicting upon this point. But the evidence tended in various ways to support plaintiff's theory that the shock resulted from a contact of the pole with the phase wire nearest to it, that such wire was not insulated, and that had it been attached to an insulator on a pin in the pole before fastening it to the cross arm, as was subsequently done, an accident in the manner indicated would have been averted.

That said feed wire was uninsulated, as we understand the term, and in close proximity to the pole, were undisputed facts. Where, under such circumstances, a feed wire carrying such heavy voltage is likely to come in contact with the pole, ordinary precaution against danger would seem to require that the wire be either insulated or fastened in such a manner as not to touch the pole, especially as employes were manifestly liable to be sent there to fix the transformers

or fuse boxes. It became a question of fact for the jury, therefore, to determine from the evidence whether such construction constituted negligence, especially with the evidence before it that the defendant's chief operator and superintendent of the 12,000 volt construction knew four days before the accident that it was dangerous, and said "It must be fixed; it is in bad shape." After such actual notice, it was culpable negligence for defendant to permit it to remain so long in that condition. Ill. Term. R. R. Co. v. Thompson, 210 Ill. 226, and cases cited.

But it is contended that as plaintiff was an experienced lineman, employed as a "trouble-shooter"—that is, to ascertain the nature of trouble on defendant's lines, he should have observed the conditions and construction of those feed wires, and was. thus chargeable with notice of the danger, assumed the risk of it, and was guilty of contributory negligence in climbing the pole without inspecting the construction relating to them.

Whether danger from such a source was an ordinary incident of his employment, the risk of which he assumed, or one of which he would have had notice by the exercise of ordinary care, or whether the nature of his employment required that he should have inspected that part of the construction on the occasion in question, or whether he was guilty of contributory negligence in not making such inspection, were all questions of fact upon which there was sufficient evidence to justify submission of the case to the jury and a verdict adverse to defendant. "The risks assumed by a servant are such only as cannot be obviated by the master's employment of reasonable measures of precaution." Ill. Term. R. R. Co. v. Thompson, *supra;* Chi. & G. T. Ry. Co. v. Spurney, 197 Ill. 471.

Defendant's negligence to remedy the defective construction was not an ordinary and usual risk of plaintiff's employment unless he knew of it or was chargeable with knowledge. Klofski v. R. & Supply Co., 235 Ill.

146. The evidence was that he was never there before and had no knowledge of it. The record would not warrant holding him chargeable with knowledge as a matter of law.

Defendant had actual notice of this particular danger and plaintiff did not. He was sent there to fix a transformer, not to repair defective construction. He had no reason to anticipate danger therefrom while performing the work he was sent to do. There was no danger in working at the transformer while the fuse plug was out. The nearest electric point to which he was working was the lower lug in the fuse box, of which he was in no danger if he did not put his hand in the box. He knew that the phase wires above him were electrified, and that by ordinary construction they came down to the insulators on the cross arm above him, but he also knew that his work that morning did not involve touching or inspecting them. Adopting the language in the Thompson case, *supra,* "Appellee had a right to presume that reasonable care had been used to make the place where he was to do his work reasonably safe for that purpose. He could not be held to watchfulness and precautions made necessary by the negligence of defendant, and growing out of a danger for which the appellant was responsible, and of which he had no knowledge." See also Himrod Coal Co. v. Clark, 197 Ill. 514.

At defendant's request the court submitted to the jury the following special interrogatory: "Could the plaintiff, Perkins, by the exercise of reasonable and ordinary care and watchfulness on his part have avoided the injury on the occasion in question?" To which the jury answered, "No." They were thus required to pass specially upon the questions of notice and contributory negligence, which were properly submitted to them.

We do not think the court erred in not directing a verdict for defendant. The character of the evidence

was such as to render the questions of risk and contributory negligence questions of fact and not of law.

As to the contention that plaintiff failed to make out a case under any count of his declaration, it is our opinion the evidence tended to support both the third and fourth counts. It is contended that the proof failed to show that the wire, as alleged in the third count, was not insulated—that it merely showed that the insulation was defective. In testifying as to the covering of the wire, the witnesses used the expressions that it was "slight insulation," "weather-proof insulation," "not man-proof insulation." Manifestly the term "insulation" as thus used was not used in its scientific sense, but rather as synonymous with the word "protection." The definition of the verb "insulate" in connection with electricity is to separate from other bodies by the interposition of a non-conductor (Cent. Dict.); to prevent the transfer to or from of electricity or heat by the interposition of a nonconductor (Webst. Dict. Unab.). It is in this sense the declaration must be considered, and the evidence showed that the covering of the wires was not a nonconductor.

As to the fourth count, it is urged that it was incumbent upon the plaintiff to prove what the count, under the rules of good pleading, should have alleged —namely, that he did not have equal means of knowing the matters of which it is alleged he was ignorant, and that the exercise of ordinary care would not have disclosed to him the condition complained of.

The failure of the declaration to make such averments was cured after verdict, the evidence tending to substantiate them. Sargent Co. v. Baublis, 215 Ill. 428.

As to the instructions it is first complained that the court erred in modifying an instruction tendered by the defendant, which in substance told the jury that if they believed that plaintiff, by the exercise of

reasonable diligence, etc., could have observed and noted the condition of the phase wire with reference to the pole, then he assumed the risk, etc. The court added after the word "condition," the words "and the danger thereof, if any." The contention is that the jury were thus told that even though he noted the condition, but did not appreciate the danger of it, which a man of his experience would have known, then he did not assume the risk. We cannot think the instruction was calculated to mislead the jury into such a fine distinction, or that there is reversible error in such modification.

It is also claimed that it was error for the court to strike out from another instruction, given at defendant's request, the words "although but slightly." The instruction was to the effect that if the jury found the evidence bearing upon the material issues preponderated in favor of the defendant, "although but slightly," plaintiff could not recover, and the verdict should be not guilty. While that form of instruction has been used and approved, it is not error so to modify it. The jury could not have misunderstood what preponderance meant, for it was told in another instruction that if the "preponderance or greater weight of the evidence" was in favor of the defendant, it should find the defendant not guilty. It added nothing to the statement of the law or the meaning of the instruction to qualify it with the argumentative expression, "although but slightly;" these words were not so much calculated to enlighten the jury upon the meaning of preponderance, as to intimate a view of the court as to where the weight of the testimony lay.

Without discussing severally the other instructions tendered by defendant and refused, it is sufficient to say that we are of the opinion that numbers 35 and 36 required the court to state as law what were matters of fact, and that the others were sufficiently covered by other instructions.

Error is claimed in the court's refusal to permit the witness Wallace to answer the questions whether the phase wire was loose enough so that it could be blown against the pole, and whether the wire, as he found it the next morning, was close enough to the pole to touch it. Even if the questions should have been allowed, yet in view of the fact that other evidence was admitted, tending to support defendant's contention that the wire was heavy and hung some six inches from the pole, we do not think that it was reversible error to sustain the objections. The distance of the wire from the pole was testified to by several witnesses, and the character of it was shown by a specimen received as an exhibit in the case. Under such circumstances, the question merely called for an expert opinion on what the evidence enabled the jury to form an opinion for itself, namely, whether the wind would blow a wire of certain size and weight against a pole a certain distance away from it.

We have carefully reviewed the record pertaining to alleged improper remarks of plaintiff's counsel, and do not deem them of such a prejudicial character as to have affected the judgment of the jury.

More serious, however, is the contention that counsel for plaintiff insisted upon repeating prejudicial questions after the court had sustained objections to questions of similar import. While some of such questions were improper and the conduct of counsel in putting them, after warning from the court's ruling of their impropriety, rendered him justly subject to criticism if not censure, yet we are unable to say that they were of such a prejudicial nature as to have influenced the verdict.

We find no error sufficiently serious to call for a reversal of the case, and the judgment of the court below is affirmed.

*Affirmed.*